210.11.66 Julie v. Montefiore Good morning, Your Honors. Council, may it please the Court, my name is Matthew Novak. I represent the Respondent, the Gold Room, in this case. I believe the main issue presented to this Court today is whether the Commission's decision is against the manifest weight of the evidence. It is the Respondent's position that the Commission's decision is not against the manifest weight of the evidence. Therefore, the decision of the Superior Court should be reversed and the Commission's decision be reinstated for the following reasons. The Commission specifically found that the Petitioner failed to prove that the decedent, Leonard Fohl, sustained an accident arising out of him in the course of his employment with the Gold Room. This finding was specifically based upon the Commission's conclusion that the decedent's level of intoxication rendered him incapable of performing the duties of his job as a cook. This intoxication level amounted to a departure from or an abandonment from the course of employment, or perhaps in this case, an inability to even return to the course of employment. In reaching this conclusion, the Commission correctly interpreted and applied the case law involved regarding the intoxication offense to the facts and the evidence in this case. The Olin Supreme Court has held that an employer can raise the defense of intoxication in two separate circumstances. Number one, when the intoxication is the sole cause of the injury or condition in question. And two, when the intoxication reaches a level that it renders the employee incapable of performing the duties of his job, amounting to an abandonment of or departure from the course of employment. In this case, the Commission relied on that second ground and found that the decedent's level of intoxication at the time of his accident and death rendered him incapable of returning to the course of his employment for the Respondent. Due to this intoxication, the decedent was not in the course of his employment when his accident occurred. This is a factual finding and is supported by credible evidence in the record. All right. So, Counsel, we know the case law, I mean, it's a little bit, it varies. Intoxication is not a per se bar to workers' compensation benefits, correct? We agree with that? Correct. It depends upon the extreme nature of the particular facts of the case. But what I'm more curious about here is, in reading the record, reading the facts, at the time that the decedent fell down the stairs, what work-related function was he performing? He had been off his shift. I mean, I was just curious as to why he was even going down the stairs based on the evidence. Swell and the owner didn't observe him performing any tasks. He's been partying, I think, for hours. I think that's a fair analysis of what's been going on here. And then he falls down the stairs. So what was he doing? How did this even arise over the course of his employment? And that's an evidentiary question, and that's actually one of the issues in this case. There was solicited testimony from witnesses to determine why he was going down those stairs at the time of his accident. The questions that were asked were objected to on the basis of hearsay. Those objections were sustained. Any testimony regarding why he was going down was stricken from the record. So you're right. In the record, you could say that there's no evidence in the record establishing why he was going down in the first place. The burden is on the claimant to establish. Exactly. It arose out of his employment. Yeah. The burden is on the claimant to establish that he was attempting to return to the course of his employment at the time, and that his accident arose out of his employment. Is the record clear that his shift had ended hours before? There's no question about that. Yeah. There's no question about that. If he's playing shuffleboard, I take it a cook in a restaurant, in all honesty, isn't playing shuffleboard while he's cooking. Yeah. There's no question that his shift ended approximately 1 to 1.30 in the afternoon. After that, he was simply socializing with his friends, drinking, playing eucure, playing shuffleboard. If that's the question we'll be asking the other side, I anticipate. So a lot of this argument, my argument, goes along with the Commission's argument, which is the Commission just assumed for the sake of argument that the decedent was attempting to return to the course of his employment by going down those stairs. And even assuming that he was attempting to do it, he was still incapable of doing the duties of his job, and therefore he was incapable of actually returning to the course of his employment. I believe that conclusion is supported by the evidence in the record. Essentially, I think there are three things you look at when you're trying to determine whether a claimant is intoxicated and too intoxicated to perform the duties of their job. You look at the level of intoxication, you look at the effects that level of intoxication would have on the claimant, and you look at the job duties involved. In this case, the record does demonstrate that the decedent had a blood alcohol content of .185%. Dr. Lakin established that if the death was instantaneous, that would have been a blood alcohol content at the time of his accident. Dr. Lakin also opined that the decedent's level of intoxication would cause severe impairment, including impaired judgment, increased reaction time, perceptual abnormalities, and incoordination. He further noted that it would be unlikely that the decedent could perform the duties of his job safely as a cook. And lastly, Dr. Lakin opined that the decedent's level of intoxication would put him at an increased risk for falling, especially down stairs. The evidence in the record also demonstrates that the job of a cook for the respondent had many different responsibilities, many of which were dangerous. It was not a job that could be performed safely while intoxicated. Ms. Fawley, for all practical purposes, the owner of the bar and the employer, testified to the various job duties of the cook. She said these duties included using meat grinders and meat slicers, using cutlery, using hot stove or hot cooking appliances, including boiling water, potato roaster, things of that nature. The cook was also required to use the stairs five to six times a day, at a minimum, on a busy shift, in order to complete his tasks. This is a steep stairway with no handrail. Obviously a code violation, I would assume, unless Galena has no codes. I couldn't tell you if it was a code violation. Some of the witnesses described it as steep or steep for me. I'll admit there was no handrail on the stairway. And yet an employee is required to go up and down stairs without a handrail carrying things. Shocking. Apparently. Although with the facts, other than the owner having fallen one time, which she acknowledged, I believe, that she was intoxicated, no one else had ever fallen on these stairs, including the deceit. Correct. There was one testimony of somebody who said that they slipped on the stairs. They couldn't recall the date or time. They said they may have slipped once or twice. It was very speculative in terms of when that actually occurred. You know, just as important as the level of intoxication, there's conflicting evidence as to whether there was anything wrong with the stairs that would establish why the deceit was found on the stairs. There was no broken tread. There was no slippery substance on the stairs. There's nothing to suggest that would have explained his fall down the stairs except for his intoxication. If anybody would be familiar with the stairs, it would be he. I mean, he's up and down the stairs probably dozens of times or a number of times a day, so he probably knows the stairs as well as anybody in that place, correct? Correct. You know, there's also evidence in the record that delivery drivers thought that the stairs at the Gold Room were actually better than our facilities and that they essentially stated that they wished other facilities had stairs that were as wide as the Gold Rooms. Lastly, on the point on the issue of the intoxication offense, there was no evidence that the decedent ever performed the duties of his job in his intoxicated state before his accident occurred. In fact, I think the first thing he tried to do that would be considered a job-related activity, which is walking the stairs, he wasn't capable of doing that. In summary, yes. Your opponent points out that Dr. Lakin never actually expressed the opinion that he was an occlude. He was too intoxicated to perform his job duties. He argues, in effect, that he said this level of alcohol can cause problems. You know, it was all expressed, not in the affirmative. How do you respond to that? Yes. I think that it's actually the Commissioner's job to make the finding, the specific factual finding that a decedent wasn't capable of performing the duties of his job due to his intoxication. Just as it's the Commissioner's job to find that an accident was a causative factor in the resultant condition. Dr. Lakin only needed to provide evidence that intoxication at the level the decedent had would cause effects that he described. Just as a doctor testifying to the issue of causation. Did he say it would cause or did he say it could cause? I think he said it could cause. All right. And that's the distinction I think your opponent's making. Right. Go ahead. I use the analogy of determining the issue of medical causation. A doctor, when determining medical causation, is only to opine that the accident could or might have been a causative factor in the resultant condition. They need not opine that the accident was a causative factor in the resultant condition. It's for the Commissioner to make the factual finding that the accident was a causative factor in the resultant condition. Just as it's for the Commissioner to make the factual finding that the decedent's level of intoxication rendered him incapable of returning to the course of employment. The employer's not contesting this, is he? Well, that's a good question. And I think, actually, the employer has varying testimony on this. I think it's equivocal. At one point, there is a question. Who's really the one contesting this? Who is really? Yeah, who's really? Let's cut to the chase. The insurance company. Sure it is. I just don't pay. I'm sorry? Do you have an employer who doesn't contest it? Well, what the employer essentially says is that, she gives the opinion, you know, the question is, did he appear fine and capable of doing his job? Everything the employer is saying here, in the course of arising out of, is not arguing them, right? I mean, if you look at the employer's evidence. Well, I mean, I think it's equivocal. I think at one specific general question, she says, you know, the question was, is he capable of doing his job? The answer is yes. And then it goes specific. Was he capable of operating the meat slicer? Was he capable of operating the grinder? Was he capable of operating these things that are specific to his job? When was his work day over? Right. That's the question. It had been over for hours. Right. That's the question. Right. Here's the problem that I have with this case, to be blunt, and I'll have to ask opposing counsel. Okay. What is the difference if he had left the premises at 1 o'clock, went over and partied for 6 hours, as he was doing on the premises, came back and fell down the stairs? Are we going to be arguing this arose out of his employment? He was acting in the course of employment? Of course not. What's the difference if he's playing shuffleboard and drinking there, or playing shuffleboard and drinking somewhere else and falls down the stairs? That's why he didn't go down the stairs. We don't know why he went down the stairs, but what's the difference why he went down the stairs? Well, I mean, doesn't the petition have to prove why he went down the stairs? Right. And it wasn't proven, was it? Did the employer say why he was going down the stairs? No. The employer did not. The employer said he did not know why he was going down the stairs. Okay. And explain this flex time issue, the 30 minutes of flex time. It's a good question. My understanding is that the other... Yeah. Your understanding. Alas, the other side... That the claimant could come back at a later time to perform duties of his job as a cook. That he wasn't simply scheduled to work from 4.30 a.m. to 11.30 a.m. or 1.30 p.m. depending on the day. That he could come in later on in the course of a day, like an afternoon, to get breakfast items ready for the following morning. And the employer allowed that, and then they would save up that time and apply it towards, I think, vacation. And wasn't there testimony that he routinely did that? Yes, there was. You know, there was testimony that he routinely would do that. Is there evidence in the record that use of that time to get ready for the next day, et cetera, that he would be going to the basement to get materials that would be useful to do a short-order cook in the morning at 4.30? Yeah, I believe so. Okay. Yeah. Well, the fact is, though, in this case, and, you know, let's be intellectually honest, there's no evidence in this record as to really, at the moment he fell and died, why he was going down there. Right. Okay? Any evidence that was brought up? No evidence was objected to or stricken. The Exhibit 3, the second report from Dr. Lincoln, does it, in fact, say that alcohol was a significant factor contributing to his accident, that it was or was not? What does it say? I couldn't recall off the top of my head what it actually says, but I believe he says, you know, the difference between the two Lincoln reports, what I recall, is it talks about the claimant's ability to do the duties of his job and that he would have, I guess, an impaired ability to do the job and he would not be able to do it in a safe manner. But I don't recall if it specifically says, you know, the proposition you say that he was significant, that it significantly contributed to his cause of death. I know the autopsy report listed it as a contributing cause. Acute ethanolism was listed as a contributing cause to the scenes. Arbitrators opinion says it says that. Well, I'd have to grab the record and I wish I had with me and I can address that certainly in rebuttal. So, if there are no further questions, I'd be happy to relinquish my time. Thank you, counsel. Thank you. Counsel, please. Good morning. May it please the Court. Opposing counsel. My name is Peter Arling. It is my privilege to represent the claimant, Julie Fole, as surviving spouse of Leonard Fole in this matter. Counsel, I know you're prepared to give a very compelling, emotionally logical argument, but I think you can discern what the concern is. Sure. Where does it establish why he went to the basement? Because I don't think you'd be arguing that he was working while he was playing shuffleboard and drinking there. I agree with you, Your Honor. He was not working while he was playing shuffleboard. He was not working while he was playing euchre. He was working at the time he left to go open the door, walk through the door to go into the basement. And I don't have the exact site. I believe I have it in my brief where, again, it was his routine habit. He would go back at the end of the day. He would check at the end of the day to make sure everything was ready. The employer, respondent in this case, testified that she would expect him to go back and make sure his bin was ready in the morning. To let me put it into a little better context for you, Your Honor, Galena, Illinois, it's like a lot of small communities. I'm very familiar with that. I like it. Okay. So you're very familiar with Galena. Absolutely. You're probably familiar with the buildings in Galena. These are not brand-new buildings. It's a beautiful, historic city in the wonderful state of Illinois. Mr. Full was the short order cook. He was the man in charge starting at 435 o'clock in the morning. And when he got there, people would be lined up waiting to come in, have coffee and breakfast, as the respondent testified to. The respondent, the employer in this case, also testified that Mr. Full, again, would routinely come back at the end of the day to make sure the side meat was ready, to make sure the potatoes were ready, to make sure the bin was ready. And I think to generally quote her, he absolutely would have done that because 430 tomorrow morning there were going to be people waiting to get in. He had to be able to grab the bin, get it upstairs and get ready. Let me ask you this, then. Yes. In your argument, then, this man would never be off the clock. He could be out somewhere doing whatever family function, golf outing, whatever, and if he ever showed up back at the restaurant, he was on the clock. It has to be your argument. My argument is that when he went back to perform duties for the employer, he was back on the clock, Your Honor. That is correct. So he's never off the clock. Whenever he would go back onto the premises and go to the basement, he would be on the clock. In this case, yes. Now, I can't come up with an example that he wouldn't have been. I think the one he wouldn't be on the clock because it seems to be because of this, you know, reason that he would have to go in the basement to get ready for the next day, that any time he went to the basement, he'd be on the clock. And I think that was the employer's testimony, Your Honor. She testified that the only reason for him to go to the basement was a work-related reason. There wasn't a restroom down there. There wasn't another exit down there. Patrons weren't allowed down there. The employer's testimony is only employees or people with business or with items to do for the business were allowed to open the door, to walk through the door, to shut the door, and to walk down the stairs. I would say in this case that there's sufficient evidence to support it in the course of it. Now the question is, it seems to me, is the degree to whether he has taken himself through his alcohol level out of it, out of his employment. I mean, is that really going to be the issue here? To cut to the chase, I would agree that seems that's the issue that I've picked up on. That's the issue that I believe it seems to be. I don't disagree that the law on intoxication in Illinois is fairly well-developed. I think one of those well-developed factors is there is no per se level of blood alcohol concentration that says, hey, if you ring the bell here, you're too intoxicated to perform your duty. And the cases sort of go, sometimes if it's around 2-0, the benefits are denied. Sometimes it's above it and they've been granted. I mean, there's no definitive. But therein lies maybe your hurdle and your problem. If you're going to argue manifestly, you're arguing against the commission's decision, correct? Correct, Your Honor. So you have the burden in that sense. And I'm glad to grasp that burden. In this case, we have the evidence before us is essentially five testifying witnesses and Dr. Lykin, Lykin or Lykin, I apologize if I'm mispronouncing the name, five testifying witnesses. Even if you assume that the claimant, Julie Full, my client in this matter, assume she's biased. If you assume Donald Bennett, a friend of both the respondent and the claimant, is biased. Assume Glenn Harris' bias is a friend of both parties, claimant and respondent. And then assume that John Wright's is also biased. Even if you assume all four of those are biased, we still have the employer who testifies. What are you saying? You call them. What are they doing? I'm sorry, I can't hear you, sir. Well, I can't understand what you're saying these witnesses did or said. I'm sorry. Let me back up a little bit and provide a little more. They all testified to the degree of what Mr. Full's physical abilities, his mental acuity, they testified to tangible what they saw, what they heard, what they experienced with Mr. Full immediately prior to his accident. They testified that he capably played the game of Uyghur for three or four hours, and they were playing for money. It's something where you have to have your mental faculties about you or you're going to lose a lot of money. They testified that he capably played shuffleboard, which involves mental and physical ability, again, to the point where even the employer in this case, Ms. Swally, she testified he was fine, he was on his shots, he ambulated fine, he was not unsteady on his feet. I mean, all of these outside indicia of was he impacted by his blood alcohol content, because there is a difference between intoxication and blood alcohol content. You know, my trouble with this is twofold. First of all, there's three things that the commission found. Number one, they found that all of these witnesses were biased and unbelievable on the question of what he was capable of doing, credibility, their job to do. Next, they put an interesting phrase in the opinion. No one will ever know why the petitioner went down the stairs. Perhaps he went to wish a happy new year to his employer or perhaps to prepare materials for breakfast the following day. Well, it's your obligation to prove why he went down those stairs, because unless you prove it to the satisfaction of the commission, then you can't recover. All of yours is on whether his habit is to do this, his habit is to do that. Next, they put an interesting phrase in the opinion.  then you can't recover. Next, they put an interesting phrase in the opinion. Are you suggesting that there's evidence in the record that the man never went in the basement ever in his life unless he was working? There's evidence in the record, and I'm sorry. What he usually did. There's evidence in the record of what he was going to do that was not objected to that came in, and I believe it was under Julie Full's testimony. I apologize. I don't have the direct site, but to the effect that he went to the basement to take care of what he needed to do. Well, the point of the matter is that the commission found her biased and unbelievable. The commission, you're right, the commission did find the four people biased and unbelievable. The commission did not opine as to the credibility or non-credibility of the employer, the respondent in this matter, and respectfully, Your Honor, the employer in this matter testified there was no other reason for Mr. Full to go to the basement. So he's apparently ignoring the respondent as well, and that's why we're saying he. So let's cut to the chase here. Yes. Everybody else except the employer, Swally. Sure. The fact finder was found incredible, unbelievable. So Justice Hoffman's observation, we just don't even listen to those. So you're saying you're left with one person they did not find incredible or unbelievable. Is that correct? Is that what the record would show? The record would show that correct, that at least based on the arbitrator's decision as affirmed and adopted by the commission. Which is the fact finder. Which is, right, the fact finder. But she never, she was in the basement. She was. She never spoke to him before he went down those stairs, and she specifically testified that after he fell down the stairs, he was unconscious and she didn't speak to him then. Correct. So how could she possibly know why he went down the stairs? Based on his history of working with this business. No, no, we're back to his history. And then we're back to, we have to come to the conclusion that the man never goes in the basement unless he's working. Correct. Never, ever, ever. Correct. And that was stated, too, by the employer. The employer said there was no reason for him to go to the basement for other than business purposes. And, again, I might not have it verbatim, Your Honor. When Lichen turns around and says at this level of intoxication, he's two times the legal limit. Two times the legal limit for driving purposes, Your Honor. And, again, I understand the .185 blood alcohol level is not, I mean, that is something, but it's a blood alcohol content. And when you say two times the legal limit, that's a similar argument that Respondent made. We're talking for driving purposes. Well, the case law is clear. Correct. We don't need to go into it. We understand that. Okay. Okay. Whose burden is it to show them that he is so intoxicated he can't perform his normal job? It is the employer's burden to show that he is. Under the act as it existed then. Correct. And what did Lichen say? I'm sorry? What did Lichen say in his professional opinion? He issued two reports. Very interesting. He did issue two reports. And the first report was February 4, 2008. The second report, which is almost verbatim, was March 14, 2008. What did he say? Initially, it was a pleasure talking to you about the case today. But then what he went in, so somebody from the Respondent's attorney's office did contact him. I'm assuming the February 4 report, at least in perhaps my biased eyes, is clearly not sufficient to preclude recovery protection. What does it say? The report says, Your Honor, that neurological abnormalities associated with alcohol levels of this magnitude include impaired judgment, increased reaction time, perceptual abnormalities, and incoordination. And I'm saying for purposes of the manifest weight of the evidence, the Respondent testified and refuted all of those perhaps associated neurological abnormalities. If you look at the Respondent's testimony, she testified, and you can carve out of that testimony, that there was no impaired judgment. There was no increased reaction time based on her interactions with the decedent. There was no perceptual abnormalities or incoordination. Dr. Lykin also states it is unlikely, unlikely, not impossible, unlikely that Mr. Fole would be able to perform his duties as a cook in a safe manner. Again, unlikely is a far cry from he couldn't perform his duties. Unlikely means, well, it's likely that he could. You have a doctor who never observed the claimant. Correct. Making these generalized statements. Correct. About this level of alcohol. But you have a credible witness, the employer, whose bias should have been the other way. Not in favor of the claimant, correct. Correct, who apparently is testifying. I observed the individual at that time, and they were ambulatory and on the mark. I mean, we specifically asked the employer, had you known he was going to the basement to take care of whatever he needed to take care of, had you known he was going, would you have stopped him? Her answer, no. Would you have, if he had to cut meat, slice meat, grind meat, whatever, would you have stopped him? No. He was fine. But you have still the remaining problem that Justice Hoffman presented, and that is she is saying there would be no reason for him to go other than work duty, but that still does not go to what the reason was he went down there. I mean, how do you respond to that? How I respond to that, Your Honors, is we have a consistent course of conduct with this employee, and I believe we have at least one area in the record where it came in that he was going down to take care of what he needed to do. And I think we can read that as he was going down to perform a work function. How do we know he wasn't going down to talk to her? How do we know he wasn't going down just to talk to her? Your Honor, I agree. Isn't that possible? Is it possible? I don't think so. I wouldn't go down there to have a conversation with her. That's not work-related. There's nothing in the record that shows he knew she was down there. There's nothing in the record that she said, hey, I'm going to the basement to do anything. So, again, if we're going to make the jump that he knew she was down there and he wanted to say goodbye to her, then why can't we make the equally plausible, probably more plausible conclusion that he was going to the basement to do what he always did, to check to make sure the breakfast items were ready for the next day's breakfast, so that he would be prepared when he got there at 430 in the morning. There's ample testimony in the record that this is what Mr. Full always did. He did it seven days a week? Every day of the week he did this? Maybe not every day of the week, but if you go back, he'd been there 15 1⁄2 years, and witnesses testified this was his routine on New Year's Eve. He'd stick around after his shift. He would interact with the people. He'd play euchre. He'd play shuffleboard. See, the problem I'm having, and I'm telling you totally candid with you, I'm troubled because this is a man who would never be outside the covers of the Workers' Compensation Act. I mean, you have to be honest about that. That's what you're saying. Anytime he would ever go into that basement, he's covered. No matter what he was doing before that, no matter what was happening, he's covered. That has to be your argument here when there's no evidence in the record to delineate why he went down there specifically. And that is my position. And, again, given this employment relationship, the employer allowed him this flex time to come back and do these items. So I don't think it's fair to say that the relationship the employee and the employer had, and had had for 15 1⁄2 years, is suddenly going to be used against him. Here's the point. Skills gets back to, you're saying it's a reasonable inference that he was in the course of his employment, and that's all we're talking about, when he went down the stairs and fell. Right? Why is it not a permissible inference that he was not? Who makes that decision? And if I misspoke earlier, I believe that there is information in the record that showed he went to the basement to take care of something not. I think it's more reasonable, given the facts of the record, that he went to take care of a work matter as opposed to perhaps saying goodnight or goodbye. But that isn't the test. Would you agree it turns on an opposite conclusion as clearly apparent? You have to establish the conclusion opposite to the commission. They drew the inference that there wasn't sufficient proof. So how could it be against the manifest weight of the, how could an opposite conclusion clearly be apparent here? The hearsay statements that were excluded, that Judge Kelly said should not have been excluded. But they were. They were excluded. But you can, from the record, and we have the case law in our brief, from the record, you know where the questions were going, you know what the answers were going to be. We know what was going, what the answer is going to be based on the questions before and the questions after in the record. So whether or not the actual answer was excluded, the arbitrator never asked for a proof of claim. We did not believe a proof of claim was necessary at the time. We have the case authority in our brief on that point. Given that. How do we know what the answer was going to be? If you, it's, I believe that it's from reading the questions leading up to and the questions after, it is clear what the answer was going to be. Was there an offer of proof?  Whose obligation is it to ask for an offer of proof? I believe the case law, as we set forth in our brief, shows that an offer of proof is not necessary if it's obvious from the form of the questions before and after. And who were these questions being asked of? Multiple witnesses, Your Honor. The ones that the commission found were biased and unbelievable. Also of, I believe a few of the questions were of the respondent, Ms. Swallow. He worked for her for 15 years? 15 and a half years, Your Honor. Now, the other interesting thing is, and I realize it's in the province of the commission and the arbitrator to determine credibility. A review of the record doesn't seem to show any hard fact as to why the credibility would have been questioned. They were all his friends. And they were the friends of the respondent, equally the friends of the respondent. And the respondent isn't going to pay this out of her pocket, is she? I don't know what the respondent's. You know the respondent's. The respondent's. But premiums out of her pocket are set by claim. Correct. And the respondent's business practices can be changed or left the same based on what may or may not happen with employees. Isn't the respondent a personal friend of the decedent? Is anybody contesting that? This is not strictly an arm's length.  Is it? No. The respondent is friends with all these people. Including the decedent. Including the claimant. Including the witnesses. In a town of less than 4,000 people. Probably including the insurance agent. I don't know how you're going to get past that. I mean, to think that we're going to have non-familiar, non-related witnesses with the decedent at the time of his death on New Year's Eve, I just. That's fine. Right. But the commission can take that into consideration and say, look, we just don't believe it. We think you're trying to do this lady a favor. We want to see her get some collection. So we'll all say that he was. The employer says he wasn't intoxicated. How do you explain his blood alcohol level? Did he get that drink in milk? Nobody ever disputed that he hadn't been drinking. We don't dispute that he probably had the blood alcohol content of .185. That we don't dispute at all. I think it was Mr. Novak who made the argument at the circuit court level of, you know, he's a functioning drunk. I can't talk to that. But what I can tell you is, based on what the witnesses testified to at the arbitration hearing, including the employer, he did not show any signs of impairment. He was able to, and one point I want to make, there's been a discussion of he didn't enter his employment until he walked down the stairs. That is not correct. He entered his employment at the time his hand touched the doorknob and he opened the door to go to the basement. Thank you, Counsel. Your time is up. Thank you very much. Yeah. To answer your question, Your Honor, Dr. Lakin's second report, he does say that alcohol would be a significant attributing factor to the cause of the accident in this case. He also said that alcohol at that level would affect his ability to do what? To ambulate stairs, to do the job duties of a cook in a safe manner. But he never observed that. What else? What else couldn't he do in the first report? In the first report, he had impaired judgment, increased reaction time, perceptual abnormalities, which obviously would affect walking down stairs and in coordination. And it says specifically alcohol would affect the ability to ambulate or descend stairs. Do we operate meat slicers with perception affected? I would hope not. In fact, I think even the employer said that she took off a piece of her finger and a meat grinder and she wasn't intoxicated. She simply wasn't paying attention. So it is a dangerous job. And lastly, on the point of the employer, I think the court is making a good point. She is simply another witness to this case. And there are various motivations she could have to testify the way that she did. Well, I suppose I'll ask you a rhetorical question. If the employer says she observed no abnormality and four other people said that they observed no abnormality, and the commission said we don't believe the four other people because they're biased, what do you think the commission's opinion of the employer's testimony was? Well, actually, I think that the commission lumps in the employer's testimony as well. It just says that the witnesses that the Petitioner provided were not credible. And I think that they included Ms. Welling, not specifically in the paragraph, but I think that she's included in that general statement. Because she is a friend of the decedent. She's known him for 15 years. She has a very high opinion of him. And there may be other motivations for her testimony. Do you have any further questions? That's all I have. I have a question about the meat grinder and all of that. What's the relevance of that? The relevance of the meat grinder? Yeah. Yeah, the meat grinder, the meat slicer, these are all equipment that you can be easily injured while using. And I think that you have to have a high level of concentration and high level of function in order to use them without being injured. But he wasn't engaged in doing that when he fell, was he? No, he was not engaged in doing that when he fell. And I think the question is, though. On his flex time, did he use the meat grinder? Is there any evidence? I don't think there's any evidence. Thank you, Counselor. Thank you. Clerk will take the matter under his writing for disposition. Clerk, please call the next case. 210-1232, City of Aurora v. Lisa Carter. Please be seated. May it please the Court, Mark Matranga for the City of Aurora Appellant. We're here before the Court to ask the Court to enforce or reinforce what we consider to be basic workers' compensation law, which is that not everything that happens at work is compensable. This case involves an injury to this police officer who is described by her position as heavyset, elsewhere in the records as 260 pounds, who, while exiting her vehicle at the beginning of the day, this was at the police department, on the police department's premises, of course, but she had not yet started her shift. When she put her weight onto her left knee, she felt pain. And subsequently was found to have chondromalacia, underwent surgical procedures. City of Aurora submits. Dr. Cole said two things. One, the absence of pre-existing symptoms and the, quote, mechanism of injury, unquote, made the injury work related. But his records, when he first saw the petitioner and had a knee survey, I cannot represent to the Court that the petitioner filled this out versus the doctor, but the knee survey portion of Dr. Cole's records from January 2007 stated that she was at work, getting out of the squad car, heard pop in the left knee. Now, later on, there's testimony about twisting the knee. I suspect after she felt the pop and the pain, she may have twisted the knee. But that's not what's crucial for this case. We have other cases getting up out of chairs, Board of Trustees. We have cases getting up from a small preschool chair. I don't know if any members of this Court ever attended the types of things I did at one time where we have the preschool parent-teacher conferences and we sit on these very low things. I've still been amused that the claimant did not prevail in Hansel and Gretel, but she did not, arising from that small chair. It's not a very normal chair for people, and she blew out her knee. Granted, she had a pre-existing problem. But nonetheless, Hansel and Gretel getting up from, Board of Trustees getting up out of, and then the Margaretville case, getting out of an automobile, which was wrenched in between, there was an eight-inch gap between Clarence's car and... Those cases affirmed the commission, or what they do with those cases? I cannot recall, Your Honor. I would not want to represent that they affirmed the commission or that they reversed. I'm sorry. But the basic proposition, again, is that not everything that happens at work is compensable. Exiting a vehicle in the Margaretville case where the testimony is pretty specific, the woman had to squeeze eight inches is not very much. We've all had to do that. And in so doing, she twisted her knee. It's very plausible. We can visualize this. Her claim was denied because the act of exiting the vehicle was a normal type of activity. Your point is well taken. We all recognize, and there's dozens of cases, that not every accident that happens at work is going to be compensable. Okay? But you've got the arbitrator viewing the claimant specifically. Something unusual here in full gear, full work gear, getting it, you know, taking into consideration the weight of the gun belt, the accessories, all of those things, and the commission found there was a causal connection between the claimant's work and the injury. And we know the appropriate test is there some evidence in the record to support the commission's decision. They weigh the evidence. It's conflicting. Tell us why there is no evidence in the record to support the commission's decision. Cutting right to the chase. Very well, Your Honor. With regard to the gun belt and the vest, there's no claim. Petitioner didn't claim that those caused her injury. No, but didn't she say it made it more difficult getting in and out of the squad car? Isn't there evidence in the record that it made it more difficult? She may have said that. I agree. But the question is, does that make a causal nexus between what happened to her? And the answer is no. The basic physics of exiting a vehicle, whether one has a vest on or not, whether one has this belt on, just for whatever it may be worth, the testimony was that it was 30 pounds. I think there are several cases that are in the record here where other police officers were wearing 9 and 10 pounds. But we'll just put that hyperbole out for the moment. Do you think getting out of a car with a full gun belt and a bulletproof vest is the same thing as getting out of a car without it? It's possible, Your Honor, that it may be under certain circumstances. But there's no claim here by the petitioner that it was. After all, there are five histories given to the emergency room, Rush Copley, Dr. Angel, the therapist, Dr. Player, and Dr. Cole. They all say the same thing. I was getting out of my car. I put my weight on my left leg, my left knee, as we all would, and I felt pain. She was 260 pounds. You know, I don't, you know, I've been gaining weight as I've been getting older. I don't want to pounce on someone for their size and weight. But it's quite apparent. We can't be somatite discriminatory, can we? Well, as I said, I don't want to try to. And you also realize this is being recorded for posterity. This would be your legacy. So you do want to maintain some political correctness, I suggest. I have a nephew who's a Chicago police officer, and I hope that will counter some of what I may say. They are going to give quite a bit of importance to the outfit that the claimant had on, didn't they? I think he did, although the commission's decision, you'll see, it says that there is a great amount of evidence in the record to support this. There's no serious dispute in the evidence. The practitioner's left knee injury is causally related. Multiple statements of causal connection are found. They don't tell us what those were, but they do go out of their way to specifically deny anything Dr. Player has said. Based on the claimant's testimony and the arbitrator's observations, it is clear that the protective bulletproof vest along with the gun belt and accessories would make getting in and out of a squad car substantially different than an ordinary person in street clothes getting in and out of a personal vehicle. Kind of shoots a hole in your theory that she wasn't doing anything different than what the general public does, doesn't it? Well, again, Your Honor, she was exiting her vehicle. She gave five histories to doctors that she was just exiting her car as one would. In fact, Dr. Player's report is as one would exit one's own car. My goodness, if this were the case, perhaps ironically I would be looking for more business, but we would have an epidemic of officers having injuries. I do know that the Chicago Police Department has changed vehicles recently, but these are standard automobiles. If they were that difficult to get into and out of, why is the police force using them? So all I can say is that she was getting out of a vehicle the same way she would have got out of any vehicle. If her family car was easier to get out of because it was a Ford Explorer, it would have been more difficult to get into because it's higher. And so be it. Can I turn to something so simple? She was subjected to a risk because of the uniform and the weight of the uniform that the average person isn't, as Justice Hoffman points out, because people don't get in and out of cars with duty belts and 30 pounds of weight on them. Do they? You're saying logically this shouldn't be effective, but the commission found that it was. Why should we substitute our judgment for the commission based on your analysis of the real world, your personal analysis of the real world? Oh, I'm sure that my ‑‑ I'm relatively confident in my personal analysis of the real world because, again, I'm relying on what the petitioner said when she went to five doctors. She was just getting out of her vehicle. She put her weight on her left leg, and she felt pain. Well, can't we affirm on any basis in the record? Can't we say the arbitrator viewed the claimant, viewed the duty belt, considered her weight, the weight of the duty belt, and found that there was a causal connection? Why can't it be that simple? If the commission had laid out what the causal connection was, all I have is multiple references. I think there are multiple references. Well, they adopted the arbitrator's decision. That was the arbitrator's decision. That's correct. The arbitrator had considerable detail in talking about the evidence. Well, again, the conclusion that there's a causal connection based on the vest and on the belt, as I said, I don't know, I don't see the petitioner having claimed that because of these devices she exited awkwardly. She just said it was different than getting into and out of her vehicle, as we point out in our reply brief. The physics of this is the same no matter how we deal with it. One exits a car by putting one's weight on one's left side. This lady was heavy set according to Dr. Cole. Dr. Player said, you're this heavy, you have a valgus deformity, bow legs, this is going to happen to you. We submit that's not an exit. If there's evidence that she's in and out of the car to a greater extent than that of a member of the general public, does that change the analysis then? Not in my opinion. I'm aware of a case law on that subject, Your Honor, but all I can say is this. This was the first time she exited her vehicle on that day. So getting into and out of her vehicle 40 times a day, as far as I'm concerned, is a non sequitur. It really has nothing to do with why she injured her leg at that time, in that place, and on that day. What had to do was her weight and putting her weight on the left leg, which was compromised. Because you say the record doesn't contain any evidence that the frequency of her getting in and out with all this equipment on during the course of a work day has weakened that member? Oh, it does. Well, there is evidence in the record. Had this happened at the end of the day, Your Honor? If this happened after she had gotten into and out of her vehicle 40 times? We might not be standing before you. Thank you, Counsel. This was the first time. Thank you. Counsel, please. Good morning, Your Honors. Craig Mielke on behalf of Lisa Carter, a petitioner in Appalachia. I'll try to be brief. I know Mark. I love Mark. I don't really understand his view of this record. There is ample evidence of several independent reasons why this is a compensable claim. The petitioner testifies that because of her protective vest, gun belt, nightstick, radio, she's a Christmas tree of police equipment. She says, point blank, it's more difficult to get out of my car. How do I do it differently? I twist and turn at the same time. That's in the record at C-7172. She also says that on this particular incident, how did I get out of the car? As I put my foot down, you have to obviously, with all this gear on, you have to twist and move. That's at record C-7374. Can I ask a question? Sure. Doesn't everybody twist and do the same thing when they get out of the car? I don't believe so, not with all this junk she's got on her waist. I can't imagine getting out of a car that you don't twist. Personally, I notice a difference the way I get in and out of a car, whether it's summertime and I'm wearing a T-shirt, or it's wintertime and I've got a thick coat on. These police officers, I don't understand how they can even sit down and be comfortable with all this stuff that they have to wear around their waist, and then they have this protective vest on, which is somewhat flexible material. It's not like wearing a coat of armor, but it's a heavy, thick material. You move differently. You move more stiffly if you're a police officer. It's almost like having several of your lower vertebrae fused in place because you can't twist around as easily with all this stuff on. But then Dr. Cole also says she did twist and turn. She's trying to twist and turn. She said she was trying to? You have to twist and move as you get out, yes. I'm trying to imagine how that's different than what a normal person does. I know I twist and turn when I get out of a car. Sure, you do, but you don't have a service revolver on your left hip that's going to put that left hip in a different position. I assume you wear a belt, but you probably don't wear a two-inch thick heavy leather belt that's going to restrict the motion in the waist. It's these things that make it differently, and then Dr. Cole puts it all together and says it's the twisting and getting out of the car that is the cause of the incident. But that's just one reason, so let's put that aside. The one that Mr. Matrenga himself admits, that Dr. Player admits, it's putting the weight on the knee that caused the knee to pop that caused the injury. Yes, this woman weighs 260 pounds, but her service belt with all this stuff on it and her vest weighs an additional 30 pounds. So if the straw that broke the camel's back is a compensable injury, then the 30 pounds of police gear, that adds 10 percent to her body weight, and it's the weight that causes this incident. And so the employer must take the claimant as? Obviously. So we do have some medical testimony that that additional weight caused that. Well, medical testimony is that weight caused was one of the causes. The weight placed on the knee was one of the causes of the injury to the knee. But we don't know whether it's her weight, and the tipping point is the weight of the paraphernalia she's wearing. We don't know anything about that, do we? We certainly didn't get to that fine of a point in any of the testimony. I'm not aware of any decisions one way or the other that ever get to those absolute fine points. The fact of the matter is it was one of the causes was the weight, and part of that weight was the employer-mandated gear. And it's not an insignificant amount of it. I mean, Mr. Matrenga points out there's other appellate cases that indicate a police officer's belt might only be 10 pounds. Maybe that's true for other departments, but here the belt is not only the service weapon and other gear. It's also a radio, and then it's also this vest. So there's no disputed evidence that it's 30 pounds? Right. And that makes perfect sense to me based on, I mean, the vest that these officers wear is relatively thick. It's relatively bulky. And I think that vest alone probably weighs a good 10 pounds. And the service revolver weighs several pounds. Well, but there's no dispute. It's 30 pounds. Right. If the evidence is weight caused this, and if 10 percent or really more than 10 percent of this woman's weight that she's putting on that knee is the employer-mandated equipment, I think that's the causal connection we need. We also have, you know, maybe at some point in time, 20 years ago, a Ford Crown Vic was the car that people drove on the street. But at the time of this accident, the only people that drove Crown Vics were police officers. And this woman's personal car. What evidence in the record is that? Pardon me? Where is that, that the only people who drive Crown Vics are police officers? I would say that you could almost take judicial notice of that, Your Honor. What if one of the justices was driving a Crown Vic? Pardon? What if one of the justices drove a Crown Vic? Possible. The same as a Mercury. And they still made them as of, I think, this year or last year. I was going to say two years ago. But the Crown Vic, without a doubt, is the number one police car out there. And the point I was going to make, though, is the woman has a Ford Explorer, has her own vehicle, and it's like, especially if you're a heavyset person, getting on and off a higher seat is easier for you than getting in and out of, whether it's a Crown Vic where you're sitting lower. Are we getting close to these jailer risk cases in Southern Illinois? The officer who's in a Crown Vic is getting out? I'd be happy to debate that one with you because I think. . . I don't know that Aurora is Southern Illinois, but let's not get too far afield here. But the point is there are multiple factors here that make what she was doing unique. And at the bottom of the, at the end of the day, Your Honor, just like in the Margaret Ville case, that case could have been decided either way, and either way would have been supported by the manifest weight of the evidence. This case, admittedly, could have been decided either way. If the arbitrator and the commission buy, hook, line, and sink her into Dr. Player's report, they could easily have denied compensation here. But, you know, Dr. Player says she told me she got out of the car as a normal person would. I'm not real sure what that means. She was not responding to an emergency call. She was not rushing out of the vehicle. But that's not inconsistent with her testimony that she was twisting and turning due to the bulky stuff that she was wearing. Similarly, all the histories for the medical providers are perfectly consistent. I mean, she doesn't want to say, I was getting out of a Crown Vic, but that doesn't mean she didn't get out of a Crown Vic or that the medical histories are not consistent in that regard. So at the end of the day, there is ample evidence in the record to support the arbitrator and the commission's decision, and I would ask that the commission be affirmed. Thank you. Dr. Cole. If I may, just one point I would like to emphasize on the causal connection opinion of Dr. Cole. I believe I started to answer that question, but then probably. You got confused by the Crown Vic. Probably. Yes, I did. I'm still trying to sort through that. And I'll get to that. But I think I may have confused myself on that subject and gone off on a tangent. However, Dr. Cole said there were two reasons for his opinion that it was work-related. In the state that there's a causal connection, it was work-related. One, an absence of preexisting symptoms, and two, the mechanism of injury. At the time he said that, there was no mention of twisting. The only history he had was her just exiting the vehicle. The reference to twisting came several months later in his records. Where that came from, I don't know. Maybe he just assumed it. But at the time he said, I think it's work-related, he said two things. One, absence of preexisting symptoms, and two, the mechanism of the injury, whatever that was. All he knew about the mechanism in terms of his own history was that she was exiting the vehicle and she felt pain. If he had the other medical records, then he would have learned from those fundamentally the same thing. Well, there were preexisting symptoms. She told Dr. Blair she had had crepitation in that knee. In fact, in both knees. There's no doubt that she's got problems in both knees. And she had had that previously. Why Dr. Cole didn't know that, I don't know. So that's the doctor's opinion.